IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VINYL INTERACTIVE, LLC, a Delaware Limited Liability Company,<br><br>    Plaintiff,<br><br>    v.<br><br>ANTHONY GUARINO, an individual; and EDUCATIONDYNAMICS, LLC, a Delaware Limited Liabiltiy Company,<br><br>    Defendants._____/ | No. C 09-0987 CW<br><br>ORDER GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION, AS MODIFIED |

   Plaintiff Vinyl Interactive, LLC, charges Defendants Anthony Guarino and EducationDynamics, LLC (Eddy) with misappropriating its trade secrets.  Vinyl now moves for a preliminary injunction prohibiting Defendants from engaging in such misappropriation and from serving Vinyl's clients or using companies that promote Vinyl's product.  Defendants oppose the motion.  The matter was heard on April 23, 2009.  Having considered oral argument and all of the papers submitted by the parties, the Court grants the motion, as modified.[1]

---

[1] Vinyl is reminded that General Order 45, which concerns the Electronic Case Filing system, provides, "Documents which the filer has in an electronic format must be converted to PDF from the word processing original, not scanned, to permit text searches and to facilitate transmission and retrieval."

BACKGROUND

Vinyl is in the business of online "lead generation." "Lead generation" is the process of identifying potential customers for a particular client. Vinyl generates leads for a number of educational institutions such as colleges, universities and trade schools. In this context, a "lead" is information about an individual who is interested in pursuing educational opportunities and may potentially choose to enroll in the client's school.

This lawsuit concerns a lead generation operation run by Vinyl called "Free College Scholarships" (FCS). As part of this project, Vinyl maintains a website through which interested individuals may fill out a "lead form" that requests their contact information and asks certain questions designed to gauge the "quality" of the lead. "Quality" refers to the likelihood that the individual will ultimately enroll in the client's school. Vinyl states that quality is a "key metric" in the lead generation business because clients are willing to pay higher rates for high quality leads than for those leads which are not likely to materialize into actual enrollment. In exchange for filling out the lead form, individuals visiting the FCS website are entered into a raffle through which they can win a scholarship.

Individuals are directed to the FCS website through advertisements deployed by "publishers" whose services Vinyl purchases. The ads are typically either emails or hyperlinks on other websites. Hyperlinks can take various forms. One is a "banner," a graphic advertisement box located on a particular webpage. Another is a "search ad," a link that appears among a

2

list of search results and relates to the search terms that were entered. In the case of email ads, the publisher is the sender of the email. In the case of banner ads, the publisher is either the website's owner or another entity that pays the owner to display the banner. In the case of search ads, the publisher is generally an entity that has purchased keyword advertising on a search site.

In addition to engaging publishers directly to deploy its advertisements, Vinyl also relies on the services of PubNet, a "publisher network."[2] PubNet maintains relationships with a number of publishers and, for a fee, distributes Vinyl's ads to them.

Guarino began working as a marketing analyst for Vinyl's FCS project in July, 2006, shortly after he graduated from college. According to Vinyl, Guarino was a key member of the FCS team who had access to the company's confidential information. As a condition of his employment, Guarino was required to sign a document entitled "Employee Proprietary Information and Inventions Agreement." By signing the document, Guarino agreed to "hold in strictest confident" and not to "disclose, use, lecture upon or publish any of the Company's Proprietary Information." Malach Dec. Ex. 2 ¶ 1.1 The agreement defines "Proprietary Information" as "any and all confidential and/or proprietary knowledge, data or information," including but not limited to:

> (a) trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques . . . (b) information regarding plans for

---

[2] "PubNet" is a pseudonym; Vinyl considers the actual identity of the company to be confidential.

3

>       research, development, new products, marketing and
>       selling, business plans, budgets, and unpublished
>       financial statements, licenses, prices and costs,
>       suppliers and customers; and (c) information regarding
>       the skills and compensation of other employees of the
>       Company.

Id. ¶ 1.3.

In May, 2008, Guarino decided to move to Seattle from the San Francisco Bay Area, where Vinyl is located.  He submitted his resignation on approximately May 19, but Vinyl asked him to continue working for the company remotely from Seattle until he found a new job, apparently to facilitate the transition of his replacement.

While searching for employment, Guarino responded to a job advertisement for a position with World Class Strategies, a division of Eddy.  Eddy is a competitor of Vinyl's in the online lead generation business.  Eddy offered Guarino the position and gave him a $10,000 signing bonus.  Guarino has submitted a declaration stating that Eddy offered him the bonus because he was considering accepting a competing offer from another company that would have paid him a higher salary.  However, a declaration submitted by Eddy's Senior Vice President for Media Services states that the bonus "was intended to compensate for a lower salary than Mr. Guarino said he was making for Vinyl."  Poraj-Kuczewski Dec. ¶ 9.  Guarino asserts that he did not agree to join Eddy and did not meet with any of its employees before he moved to Seattle. Eddy has not clearly identified the dates or substance of its initial contacts with Guarino.

Around the time it hired Guarino, Eddy began developing a new

4

product, JumpStart.  Like FCS, JumpStart sells leads to educational institutions, and thus the two products are in direct competition with each other.  Moreover, like FCS, JumpStart induces individuals to supply their contact information by offering them the chance to win a scholarship.  Defendants consider JumpStart to be distinguishable from FCS because it is ostensibly merit-based, in that scholarship recipients are chosen based on the strength of a 100-150 word essay.[3]  JumpStart was not the first product of Eddy's to offer leads to educational institutions.  However, Eddy's previous efforts differed from FCS in material respects.  For example, one project of Eddy's generated leads by running advertisements in print publications directing individuals to visit a website where they would enter their identifying information for a chance to win a scholarship.  Other projects targeted specific demographic groups as sources of leads.  JumpStart was apparently Eddy's first lead generation product that was targeted at a general demographic pool, was based on a scholarship incentive and relied on electronic advertising.

On approximately June 23, 2008, Guarino told Vinyl that he had accepted a new job, but he apparently did not identify his new employer.  Guarino states that, on approximately June 27, 2008, he told Vinyl that his new position was with Eddy.  Although the details are not clear, it does not appear that Eddy informed Guarino before he started that he would be working on a new project

---

[3]In an instant message exchange with a Vinyl employee, Guarino stated that the essay requirement exists primarily to ensure that only high-quality leads are generated.  Evans Dec. Ex. 1 at 1.

5

that was identical in all material respects to FCS. In any event, he did not inform anyone at Vinyl of this fact.

Guarino's last day with Vinyl was June 30, 2008. At approximately 4:30 p.m. that day, he had a "final wrap up call" with Vinyl's Director of Marketing. The director testified, "There should have been nothing else for Guarino to do with Vinyl after this." Morrell Dec. ¶ 6. However, at 6:30 p.m., Guarino accessed a file on Vinyl's server that contained a comprehensive set of data concerning Vinyl's publishers. Later that night, Guarino accessed another file containing information about Vinyl's publishers. Vinyl considers the information in both of these files to be confidential. Guarino states in his declaration that he accessed these files

> entirely within my capacity as a Vinyl analyst. Specifically, I wanted to ensure that the changes I had made to the previous day's traffic had proved beneficial for Vinyl. At no time did I use this information for any other purpose, nor did I retain this information or use it at [sic] any way at Eddy.

Guarino Dec. ¶ 15.

Although the details are not clear from the record, Guarino became JumpStart's Project Manager shortly after he began his employment with Eddy in July, 2008, if not as soon as he started. Eddy has not explained how Guarino came to be assigned to the JumpStart project rather than to one of the other lead generation projects Eddy claims was the focus of its initial discussions with Guarino. Nor has it clearly addressed the relationship between its decision to develop and launch JumpStart and its decision to hire Guarino, which apparently took place close in time.

6

On July 21, 2008, after Guarino had begun his new position with Eddy, he initiated an instant message conversation with a Vinyl employee. He asked the employee to send him "the table of competing sites [Guarino had] put together in the Comp Intel database." Hirschorn Dec. Ex. 1. The employee complied with Guarino's request. According to Vinyl, "Comp Intel" stands for "competitive intelligence," and the file, which took over 150 hours to produce, contained highly confidential information about competing sites. The Vinyl employee was later disciplined for sending the file to Guarino. Gaurino states that he requested only a portion of the Comp Intel database, and that the table he received did not contain any confidential information. He maintains the table could have been created by an entry level analyst in a few hours using free online tools, and he simply did not want to re-do work he had already done.

On August 12, 2008, Guarino had an instant message conversation with another Vinyl employee, during which he remarked that an Eddy manager was "surprised" when Guarino told him that Vinyl generates leads that are sold to Eddy through PubNet. Vinyl explains this disclosure and its significance as follows:

> In the lead generation business, there are occasions when competitors sell leads to one another; directly, or indirectly through a network. For example, if one of Vinyl's customers -- call it "Metropolis College" -- agrees to purchase only 100 leads from Vinyl in a given month, and Vinyl has already filled up that allocation, Vinyl might sell additional leads suitable for Metropolis College to another lead generation company that also has an agreement with Metropolis College to provide it with 100 leads that month, but which so far has not provided that many leads.
>
> PubNet is a network of publishers. Lead generation

7

>companies like Vinyl and EDDY can develop their own list of publishers with whom they deal directly, and/or deal with a network like PubNet, which in turn has the direct relationship with publishers. It is in PubNet's interest not to reveal its own publisher list, as otherwise the lead generation companies could just go directly to those publishers and cut out PubNet, saving money by avoiding having to pay PubNet's markup.
>
>The fact that Vinyl was generating leads for EDDY through PubNet was subject to a confidentiality agreement between PubNet and Vinyl, was not known to EDDY, (as evidenced by Ian's surprise at learning it), and should not have been revealed by Guarino.

Pl.'s Mot. at 9-10.  Vinyl and Eddy subsequently engaged in negotiations for the sale of leads directly from Vinyl to Eddy.  However, the two companies could not reach an agreement.  On January 30, 2009, Eddy instructed PubNet not to provide it with any further leads generated by Vinyl.

Vinyl did not learn about JumpStart until September 23, 2008, when it received an email from PubNet advising of JumpStart as a "new offer" for advertising.  Vinyl received the email because it has a publisher affiliate that is on the PubNet network of publishers.  Eddy apparently did not intend for Vinyl to be informed about JumpStart, as Eddy had directed PubNet to keep the offer "private."  On September 23, 2008, a Vinyl employee initiated an instant message conversation with Guarino to determine whether Guarino was involved in JumpStart.  The two had the following exchange:

>SteveVinylInteractive: JumpStart Scholarship huh?=)
>
>anthony: hah
>
>anthony: i don't know what ur talking about
>
>anthony: hah

8

```
    SteveVinylInteractive: haha RIGHT
    anthony: where did u hear that
    SteveVinylInteractive: i have my connections
    SteveVinylInteractive: =)
    anthony: does rob know
    SteveVinylInteractive: haha he does but not sure he put 2 n 2
    together
    . . .
    anthony: hah tell people that ask about me that I took an old
    product that we ha[d]
```

Evans Dec. Ex. 1 at 1 (time stamps removed).  The two engaged in a brief discussion about some of the differences between CFS and JumpStart.  Approximately twenty minutes later, Guarino again inquired about whether people at Vinyl knew of his involvement with JumpStart:

```
    anthony: did anyone connect JumpStart to me yet
    SteveVinylInteractive: no i dont think so
    anthony: do you think they will be pissed
    SteveVinylInteractive: nah
    SteveVinylInteractive: i mean everyone knows you left and work
    for a competitor
    anthony: it wasnt my idea. actually had no idea when i
    interviewed
    anthony: the ceo asked me the 1st day about it
```

Id. at 3 (time stamps omitted).

The next day, a Vinyl employee discovered that an unknown and unauthorized user was listed among the users with access to Vinyl's Google Analytics account.  According to the employee, Google

9

Analytics is a service that

> provides a tremendous amount of information about Vinyl's websites, showing, among other things, information about publishers, analysis of the internet traffic to each of Vinyl's websites, which publishers' sites the visitors were referred from, where the users are located, and so on. Such information is of great value to Vinyl and could be of great value to a competitor.

Millen Dec. ¶ 2. The employee sent an email to the address that was listed for the unknown user, requesting his or her identity and asking how he or she obtained access to the account. She received no reply.

Vinyl management soon learned of Guarino's involvement with JumpStart and, on September 26, 2008, sent Eddy and Guarino a cease-and-desist letter. Eddy, through its counsel, responded a few days later. In its response, Eddy claimed that its hiring of Guarino was proper and denied having misappropriated any of Vinyl's confidential information. It played down Guarino's role with JumpStart, describing him as a client account manager. This appears to have been literally true, in that Guarino's title had been changed to "client account manager" by the time the letter was written, but Eddy failed to mention that Guarino had been the JumpStart Project Manager until shortly after Eddy received the cease-and-desist letter. With respect to the unauthorized access of Vinyl's Google Analytics account, Eddy stated that the account was "tied to Mr. Guarino's personal Google e-mail account and logged him in automatically when he accessed Google mail." Carlin Dec. Ex. 4 at 3. However, in an October 9, 2008 affidavit that Eddy provided to Vinyl, Guarino stated that, after leaving Vinyl, he had intentionally logged in to Vinyl's Google Analytics account

10

out of curiosity, in order to determine whether his previous efforts to search "for traffic publishers that were misrepresenting Vinyl's offers" had been continued after his departure. Id. Ex. 5 at 2.

Vinyl was not satisfied with the explanations contained in Eddy's response to its cease-and-desist letter and in Guarino's affidavit. After attempting to resolve the matter informally, Vinyl filed the present lawsuit in state court, asserting claims for, among other things, breach of contract, interference with contractual relations, misappropriation of trade secrets and unfair competition. Defendants later removed the action to federal court.

Vinyl now seeks a preliminary injunction prohibiting Defendants from:

1. Using any of Vinyl's publishers or networks who promote FCS, in connection with the promotion, advertising or marketing of JumpStart, directly or indirectly;

2. Generating leads through JumpStart for any advertisers for whom Vinyl generates leads through FCS; and

3. Using, disclosing, or attempting to use or disclose, either directly or indirectly, any and all Vinyl trade secrets or confidential information.

Pl.'s Mot. at 1.

LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council,

11

Inc., \_\_\_ U.S. \_\_\_, 129 S. Ct. 365, 374 (2008). "[T]he required showing of harm varies inversely with the required showing of meritoriousness." Indep. Living Ctr. of S. Cal., Inc. v. Shewry, 543 F.3d 1047, 1049 (9th Cir. 2008) (quoting Rodeo Collection, Ltd. v. W. Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987)). "When the balance of harm 'tips decidedly toward the plaintiff,' injunctive relief may be granted if the plaintiff raises questions 'serious enough to require litigation.'" Id. (quoting Benda v. Grand Lodge of the Int'l Ass'n of Machinists & Aerospace Workers, 584 F.2d 308, 315 (9th Cir. 1978)).

## DISCUSSION

I. Likelihood of Success on the Merits

To state a claim for misappropriation of trade secrets under California law, a plaintiff must allege:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>
>> (A) Used improper means to acquire knowledge of the trade secret; or
>>
>> (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
>>
>>> (i) Derived from or through a person who had utilized improper means to acquire it;
>>>
>>> (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>>>
>>> (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

12

```
            (C) Before a material change of his or her position,
                knew or had reason to know that it was a trade
                secret and that knowledge of it had been acquired by
                accident or mistake.
```
Cal. Civ. Code § 3426.1(b).  The term "improper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  Id. § 3426.1(a).  The term "trade secret" is defined as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
>    (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
>
>    (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Id. § 3426.1(d).

Vinyl asserts that the following information represents its trade secrets: 1) the identity of the publishers it uses; 2) the rates it pays to its publishers; 3) the quality of leads and conversion rates for each of its publishers; 4) the prices it gets for leads from its advertiser clients; 5) the identity of advertisers that support FCS; 6) the questions it places on lead forms to produce better results from certain publishers; 7) its profit margins for various advertisers; 8) the methods it uses to identify publishers; 9) its methods for reporting and tracking the quality of leads produced by its publishers; 10) its methods for deciding how much volume it seeks from each publisher, i.e., its "mix of high quality low volume publishers" and "low quality high margin publishers"; and 11) its data on and analysis of its

13

competitors' products.  Pl.'s Mot. at 17; Poynter Dec. ¶ 6.

Through the declarations it has submitted to the Court, Vinyl has established that most, if not all, of this information is likely protectable as a trade secret.  Eddy could use this information, which is not generally available, to identify ways in which JumpStart could better compete against FCS.  The information thus has independent economic value.[4]  There is also direct evidence that Guarino accessed some of this information after starting work with Eddy.  Moreover, the circumstances surrounding Guarino's hiring and the genesis of the JumpStart program -- and Eddy's failure to explain these matters fully -- is circumstantial evidence that Eddy intended to rely on Guarino's knowledge of Vinyl's confidential information in order to obtain an unfair advantage in its development of a product to compete with FCS.

Defendants argue that the information that Vinyl seeks to protect is not a trade secret.  They note that the "identities of publisher entities are and always have been within the knowledge of companies in the lead generation industry."  Defs.' Opp. at 14.  This may be the case, but Vinyl seeks to protect not the identities of publishers generally, but rather the identities of the publishers <u>it has chosen to rely upon</u>, as well as a host of

---

[4] In addition, Vinyl has also taken reasonable measures to prevent the information from being disseminated, as it is required to do.  <u>See</u> Cal. Civ. Code § 3426.1(d)(2).  Defendants fault Vinyl for "allowing" Guarino to continue to access its Google Analytics account after he left the company.  But the record reflects that Guarino accessed the account without Vinyl's knowledge, and Vinyl made reasonable efforts to determine the identity of the unauthorized user and prohibit the user from accessing the account once it learned of the breach.

14

information about the rates it pays to those publishers and the quality of leads the publishers generate. And although Defendants contend that "lead generation companies [are] aware of each other's costs and pricing through general methods of doing business," they have not submitted a declaration from a knowledgeable individual stating as much. Instead, they rely on conclusory attorney argument. To support their position, they point to the efforts between Vinyl and Eddy to negotiate Eddy's direct payment for leads generated by Vinyl, and to the informal exchanges that took place between Guarino and Vinyl employees after Guarino left Vinyl. But the negotiations do not evidence the broad proposition Defendants advance, and the exchanges do not demonstrate that the information Vinyl seeks to protect is generally known in the lead generation business.[5]

Defendants also argue that Vinyl is not likely to succeed on the merits because there is no evidence that they have used any of the information they may have obtained, for their own pecuniary gain or to Vinyl's pecuniary disadvantage. Even accepting Defendants' characterization of California law, however, discovery has not yet commenced, and it would be unreasonable to require Vinyl to demonstrate in connection with the present motion the precise ways in which Defendants may have used Vinyl's trade secrets, given that Defendants are the only ones who possess such

---

[5] Nor do the exchanges demonstrate that Vinyl did not take reasonable efforts to maintain the secrecy of its proprietary information. There is no indication that Vinyl management ever approved the dissemination of the information that is the subject of this motion. Moreover, the employee who sent Guarino the Comp Intel file was disciplined for doing so.

information.  At this point, it is sufficient for Vinyl to demonstrate a fair likelihood that, through Guarino, Eddy acquired proprietary information of Vinyl's that could be used to Vinyl's disadvantage.  Vinyl has made such a showing.[6]  The success-on-the-merits factor thus supports granting Vinyl's motion.

III. Irreparable Harm, Balance of Hardships and the Public Interest

The Court presumes that Vinyl will suffer irreparable harm if its proprietary information is misappropriated.  See Lillge v. Verity, 2007 WL 2900568, at *7 (N.D. Cal.) ("[T]he risk of losing established customers to defendants' new business due to defendants' improper use of plaintiff's proprietary information would obviously create lasting, irreparable harm.")  However, the Court agrees with Defendants that the relief requested in the first and second prongs of the injunction Vinyl seeks is overbroad.  To prohibit Eddy from using any of the publishers or publishing networks that promote FCS, or from generating leads for any of Vinyl's educational clients, would go beyond simply preventing Eddy from gaining an unfair advantage.  Instead, it would effectively eliminate Eddy's ability to compete with Vinyl.  This would be against the public interest, which favors competition.  It would also result in hardship to Eddy, which would effectively be forced to shut down its JumpStart operations.

---

[6] As Vinyl notes, the evidence supports the conclusion that Guarino's disclosure to Eddy that PubNet was providing Eddy with leads generated by Vinyl ultimately resulted in Eddy deciding no longer to accept such leads from PubNet.  Although Defendants maintain that Eddy's decision was based on the low quality of leads generated by Vinyl, there are at least serious questions concerning whether Vinyl was damaged by Guarino's disclosure.

16

In contrast, the third prong of the requested injunction, which simply enjoins Eddy from using Vinyl's proprietary information, would further the public's interest in prohibiting unfair competition. In addition, it would not work any hardship on Eddy, which has no right to use the information in the first place. Accordingly, the Court will grant this relief.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Vinyl's motion for a preliminary injunction (Docket No. 13), as modified.[7] Defendants and their agents, servants, employees and attorneys, as well as entities working in concert with them, are hereby enjoined, pending the resolution of this action, from directly or indirectly accessing, viewing, using, relying upon, maintaining in their files, disseminating or disclosing the following types of information, to the extent the information is not demonstrably available to anyone in the lead generation business who seeks it:

1. The identity of the publishers Vinyl uses;
2. The rates Vinyl pays to its publishers;
3. The quality of leads and the conversion rates for each of Vinyl's publishers;
4. The rates Vinyl is paid for leads from its advertiser clients;
5. The identity of advertisers that support Vinyl's FCS

---

[7] To the extent that the Court relied upon evidence to which the parties objected, the objections are overruled. The Court did not rely on any inadmissible evidence in reaching its decision. To the extent the Court did not rely on evidence to which the parties objected, the objections are overruled as moot.

17

project;

6. Vinyl's profit margins associated with its advertisers;

7. The methods Vinyl uses to identify publishers;

8. Vinyl's methods for reporting and tracking the quality of leads produced by its publishers;

9. Vinyl's methods for deciding the volume it seeks from each of its publishers; and

10. Vinyl's data on and analysis of its competitors' products.

This preliminary injunction will take effect upon Vinyl's posting a bond in the amount of $10,000.

IT IS SO ORDERED.

Dated: 5/1/09

  CLAUDIA WILKEN
  United States District Judge

18